UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILBERT REYES, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 9223 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| THOMAS DART, in his official capacity as Sheriff of | ) | |
| Cook County, COOK COUNTY, ILLINOIS, and | ) | |
| SABRINA RIVERO-CANCHOLA, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Wilbert Reyes, a detainee at Cook County Jail from May 28, 2017 to August 3, 2018, brought this suit against Cook County, Illinois, Cook County Sheriff Thomas Dart in his official capacity, and Sabrina Rivero-Canchola under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794(a). Doc. 1. The official capacity claims against Dart are functionally against the Cook County Sheriff's Department, which operates the Cook County Department of Corrections, which in turn operates the Jail, *see DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 976 (7th Cir. 2000); *Thompson v. Duke*, 882 F.2d 1180, 1187 (7th Cir. 1989), so this opinion will refer to "Dart" and the "Jail" interchangeably.

With discovery completed and a jury trial set for June 3, 2019, Doc. 116, Reyes moves for partial summary judgment as to liability on the ADA and RA claims, Doc. 100, and Defendants cross-move for summary judgment on all claims, Docs. 104, 106. Reyes acquiesces to summary judgment on his § 1983 claims against all Defendants and on all his claims against

Rivero-Canchola. Doc. 120 at 1. On the remaining ADA and RA claims, Reyes's motion is denied, Dart's motion is granted in part and denied in part, and Cook County's motion is granted.

## Background

When considering Reyes's summary judgment motion, the facts are construed as favorably to Cook County and Dart as the record and Local Rule 56.1 permit, and when considering Cook County's and Dart's motions, the facts are construed as favorably to Reyes as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). The court does not vouch for the accuracy of any party's asserted facts. *See Donley v. Stryker Sales Corp.*, 906 F.3d 635, 636 (7th Cir. 2018). The court overrules Dart's and Cook County's hearsay objections to certain evidence submitted by Reyes, Doc. 121 at ¶¶ 66-67; Doc. 124 at ¶¶ 26, 32, 66, to the extent that the challenged out-of-court statements are offered not for their truth, but to prove that Defendants knew about Reyes's disability and need for an accommodation or to show how they responded when confronted with his complaints. *See* Fed. R. Civ. P. 801(c)(2); *Daniel v. Cook Cnty.*, 833 F.3d 728, 735-36 (7th Cir. 2016) ("[T]he district court correctly held that the Report could be offered for the non-hearsay purpose of proving the sheriff knew of the problems described in the Report.").

### A. Reyes's Capabilities and Preferences

Reyes has suffered from hearing loss since childhood. Docs. 121, 124 at ¶ 2. He cannot hear out of his left ear, but can hear out of his right ear using a sound amplifying device like an Assistive Listening Device ("ALD") or a hearing aid. *Ibid.* (Cook County's objection to this fact, Doc. 121 at ¶ 2, is overruled because the record material cited by Reyes supports the fact. The County's description of Reyes's hearing capabilities, Doc. 118 at ¶ 13, is disregarded because it is not supported by the record material cited by the County.) Reyes used a hearing aid

prior to his arrest, though he did not always wear it. *Id*. at ¶¶ 9-10. Reyes did not have his

hearing aid with him while in the Jail. Docs. 121, 124 at ¶ 26.

Reyes knows some American Sign Language ("ASL") but is not fluent. Doc. 117 at

¶ 35; Docs. 121, 124 at ¶ 3. (Reyes's objection to Dart's assertion that Reyes had limited ability

to use ASL, Doc. 117 at ¶¶ 33-34, is sustained. Dart supports the assertion by citing Rivero-

Canchola's deposition testimony, but Rivero-Canchola admitted that she knew only two words in

sign language. When asked how she could evaluate Reyes's sign language proficiency without

knowing sign language, she stated, "I know … from my observations of him interacting with

… sign language interpreter[s]," but provided no further detail. Doc. 102-2 at 142. That

testimony is insufficient to show that Rivero-Canchola has personal knowledge of, or the ability

to evaluate, Reyes's ASL proficiency. *See* Fed. R. Evid. 602, 701; *Ani-Deng v. Jeffboat, LLC*,

777 F.3d 452, 454-55 (7th Cir. 2015) (ascribing "no weight" to an affiant's averment that an

employer's actions were discriminatory and retaliatory, where there was no evidence that the

inference was based on facts of which the affiant had personal knowledge); *Von der Ruhr v.*

*Immtech Int'l, Inc.*, 570 F.3d 858, 863 (7th Cir. 2009) (holding that a witness could not offer lay

opinion testimony concerning a business's profitability where he did not have "the necessary

personal knowledge to give a useful lay opinion based on his perception").) The parties agree

that Reyes has some lip-reading capability but dispute the details; Reyes asserts that "it's hard"

for him to read lips "because … everyone's lips are different," while Dart asserts that Reyes can

read lips well. Doc. 117 at ¶¶ 60, 72; Doc. 118 at ¶¶ 14, 20. Reyes can speak, though he has "a

problem with [his] voice" due to his hearing disability. Doc. 117 at ¶ 37; Doc. 118 at ¶ 11.

(Reyes's objection to Dart's assertion that he spoke rather than signed during his deposition,

Doc. 117 at ¶ 37, is overruled because the assertion correctly characterizes the record material

cited by Dart.)  Reyes can read faces and gestures and can communicate in writing.  *Id*. at ¶¶ 59-60.  There is no evidence in the record concerning whether Reyes can hear others speak when they use voice amplifying devices.

Reyes asserts that his preferred communication method is using sign language while hearing sound.  Docs. 121, 124 at ¶ 4.  Dart asserts that Reyes prefers to speak and read lips. Doc. 117 at ¶ 72.  (Citing its own Local Rule 56.1(a)(3) statement, Cook County asserts in its Local Rule 56.1(b)(3)(B) response to Reyes's Local Rule 56.1(a)(3) statement that Reyes has expressed different communication preferences at different times, Doc. 121 at ¶ 4, but the County's Local Rule 56.1(a)(3) statement asserts only that he *can* or *did* communicate in various ways, not that he *prefers* to communicate in those ways.  Doc. 112 at ¶¶ 19, 21, 23, 27, 29. Accordingly, the assertion in the County's Local Rule 56.1(b)(3)(B) response is disregarded.)

### B.  Reyes's Intake, Housing Assignments, and Meetings with Rivero-Canchola

Dart has "custody and care" of Cook County Jail.  *See* 55 ILCS 5/3-6017; Doc. 124 at ¶ 5; Doc. 118 at ¶ 7.  Reyes was booked into the Jail on May 28, 2017.  Doc. 117 at ¶ 6; Doc. 118 at ¶ 8.  Reyes contends that he told many officers during intake that he was deaf or hard of hearing, but that no ASL interpreter or ALD was provided to him and no medical alert about his disability was issued.  Doc. 117 at ¶¶ 7-8; Docs. 121, 124 at ¶¶ 26-27.  Dart asserts that Reyes did not alert the Jail's intake staff to his disability.  Doc. 117 at ¶¶ 7-8; Doc. 124 at ¶ 26.

From May 29 until June 9, 2017, Reyes was housed in Division 9, Tier 1B.  Docs. 121, 124 at ¶ 29.  He then was moved to Division 9, Tier 2E, where he remained until July 24, 2017. *Id*. at ¶ 31.  Reyes asserts that he repeatedly notified correctional officers in Tier 2E that he was hearing impaired and requested accommodations, but that the officers just laughed in response. *Id*. at ¶¶ 26, 32.  A medical alert notifying Jail staff that Reyes was hearing impaired was issued

on July 17, 2017, and a second medical alert classifying him as deaf was issued on July 26, 2017. Doc. 117 at ¶ 9; Docs. 121, 124 at ¶ 30.  At some point in July 2017, Division 9 staff notified Rivero-Canchola, the Jail's ADA coordinator, Doc. 117 at ¶ 21; Doc. 118 at ¶ 6, that Reyes might have a hearing disability.  Doc. 117 at ¶ 12.

On July 24, 2017, Reyes was moved to the Residential Treatment Unit ("RTU") in Division 8.  *Id*. at ¶ 15; Docs. 121, 124 at ¶ 49.  (Cook County's objection to Reyes's assertion concerning the dates he was housed in the RTU, Doc. 121 at ¶ 49, is overruled because the record material cited by Reyes supports the assertion.)  Rivero-Canchola met with Reyes in the RTU before the end of July 2017.  Doc. 117 at ¶ 14.  Dart asserts that Reyes communicated effectively with and appeared to understand Rivero-Canchola at the July 2017 meeting.  *Ibid*. Reyes disputes this account, pointing to his deposition testimony that he could not understand Rivero-Canchola and asked her to bring an interpreter to their next meeting.  *Id*. at ¶¶ 24-25, 58; Doc. 102-2 at 46.  (Dart objects that the cited portion of Reyes's deposition refers not to a meeting in the RTU, but to a later meeting in Division 9.  Doc. 131 at 2.  Dart is mistaken.  Doc. 102-2 at 46 (discussing Reyes's meeting with Rivero-Canchola in "3H," referring to "dorm 3H" "in the RTU")).  Reyes also asserts that he requested ALD access at the July 2017 meeting, but Dart asserts that Reyes did not request auxiliary aids at that meeting.  Doc. 117 at ¶ 24.

Rivero-Canchola and Reyes met again in August 2017.  *Id*. at ¶ 27.  Rivero-Canchola brought an interpreter at Reyes's request.  *Id*. at ¶ 32; Doc. 102-2 at 46.  Rivero-Canchola arranged for Reyes's transfer to Division 10, which occurred on August 16, 2017.  Doc. 117 at ¶ 18; Docs. 121, 124 at ¶ 71.  In an August 22, 2017 email, Rivero-Canchola told Jane Grubster, a director at the Jail, that Reyes was "partially deaf" and that his "main form of communication is ASL, but he can speak a bit and read lips."  Docs. 121, 124 at ¶ 53.  Rivero-Canchola added

that if Reyes were put on a "group based tier we can get the [ALD] for him to use in groups." *Ibid.*

On November 16, 2017, Reyes was sent to the "hole" as a disciplinary measure. Doc. 117 at ¶ 19. On January 1, 2018, he was transferred back to Division 10, where (apart from a brief stint in the RTU) he remained until he left the Jail on August 3, 2018. *Id.* at ¶ 20; Docs. 121, 124 at ¶ 1.

Including the July and August 2017 meetings described above, Rivero-Canchola communicated with Reyes at least four times while he was at the Jail. Doc. 117 at ¶ 22. During those meetings, the pair discussed ALDs, face-to-face visitation, and access to a Text Telephone ("TTY"), a device that allows users to communicate through electronically transmitted text messages. *Ibid.*; *see* Fed. Commc'n Comm'n, *Use of TTY Devices with Digital Wireless Phones*, FCC.gov, https://www.fcc.gov/consumers/guides/use-tty-devices-digital-wireless-phones (last updated Sept. 8, 2017).

### C.    Meals

On May 28, 2017, Reyes's body mass index ("BMI") was 30. Docs. 121, 124 at ¶ 28. By August 24, 2017, his BMI had dropped to 26.7. *Id.* at ¶ 34. Reyes contends that he lost weight while in Division 9 because he could not hear Jail staff announce meals. *Id.* at ¶ 33. Dart disputes this, pointing to Reyes's deposition testimony that he did not want to eat because the conditions in his unit distressed him. *Ibid.*

### D.    TTY Access and Visitation

According to Dart, TTYs were available to detainees at the Jail during Reyes's time there. Doc. 117 at ¶¶ 44-45, 49, 67. According to Reyes, from May 28, 2017 until at least November 1, 2017, TTY users could make TTY phone calls on weekdays only, when

Correctional Rehabilitation Workers ("CRWs") were available, while detainees without hearing impairments could make (unassisted) calls all week. *Id.* at ¶¶ 67, 69, 76-80; Docs. 121, 124 at ¶¶ 36-38, 63, 65. (Cook County and Dart correctly note that much of the evidence Reyes cites to support this assertion is either ambiguous or inapposite. Docs. 121, 124 at ¶¶ 36, 38. But drawing all reasonable inferences in Reyes's favor, and particularly considering Rivero-Canchola's July 6 and July 14, 2017 statements, which are discussed immediately below, *id.* at ¶¶ 63, 65, Reyes has created a genuine dispute of fact as to TTY availability on the weekends.) Reyes further asserts that the Jail was aware of the problem, citing evidence that Rivero-Canchola: (1) wrote on July 6, 2017 that "[d]eaf and hard of hearing detainees do not have equal access to phones" and that "[c]alls have to be scheduled with the social workers who are not on site during the weekends," *id.* at ¶ 63; and (2) justified a July 14, 2017 request for video phone funding by stating, "Equal access to programs and services is required by the ADA. TTY technology['s] … availability is limited to the social worker's schedule," *id.* at ¶ 65; Doc. 102-3 at 53. Dart denies that Rivero-Canchola wrote the July 6 communication. Doc. 124 at ¶ 63.

On July 31, 2017, Reyes wrote to "Ms. Swanigan," a CRW, requesting TTY access. Docs. 121, 124 at ¶ 41. On August 3, 2017, Reyes wrote to Rivero-Canchola that he could not communicate with his sister using the RTU's video visitation system. *Id.* at ¶ 42. Rivero-Canchola received both letters. Doc. 117 at ¶ 26; Docs. 121, 124 at ¶ 43. (Cook County's objection to that fact, Doc. 121 at ¶ 43, is overruled because it is supported by the record material cited by Reyes, and because Reyes submitted Exhibit 4 to Rivero-Canchola's deposition with his Local Rule 56.1(a)(3) statement. Doc. 102-2 at 181-84.) When discussing the two letters with Reyes in August 2017, Rivero-Canchola learned that he had never used a TTY and did not understand its purpose. Doc. 117 at ¶ 27. Reyes did not renew his request for a TTY, but asked

instead for in-person visits. *Id.* at ¶¶ 28, 30. (Reyes does not adequately dispute those facts because the record materials he cites establish only that some of his friends have TTYs, that he knew what a TTY was at the time of his deposition in May 2018, and that he asked many times to see Rivero-Canchola in hopes that she could help him access a TTY. *Id.* at ¶¶ 27-28. Those facts do not bear on what happened at the August 2017 meeting.)

Rivero-Canchola accommodated Reyes's request by moving him to Division 10, where he could receive in-person visits through a Plexiglas barrier. *Id.* at ¶ 30. Reyes and his sister still struggled to communicate, however, because the Division 10 visitation room was noisy and the Plexiglas was dirty. Docs. 121, 124 at ¶ 56. (Dart's objection to this fact, Doc. 124 at ¶ 56, is overruled because it is supported by Reyes's sister's affidavit, which sets forth observations grounded in her firsthand knowledge. *See United States v. Proano*, 912 F.3d 431, 441 (7th Cir. 2019) ("Personal knowledge can include reasonable inferences drawn from a witness's observations and firsthand experiences.").)

On November 8, 2017, Reyes submitted a formal grievance stating that the Jail was violating the ADA by "not providing [him] with a TTY telephone system." Docs. 121, 124 at ¶ 66. The grievance added that Reyes did not have "the opportunity of hearing my visits through the visiting plexy glass for communication through that small holes in the plexy glass for communication" and that he "[s]hould be provided some form of handicap access for the deaf for communication with visiting privileges." *Ibid.* Rivero-Canchola responded, writing that "[c]ontact visits are not permitted in [the Jail] but you can sign to your family through the glass partition" and that "TTY phones are available, just notify your CRW." *Id.* at ¶ 67.

Reyes filed this lawsuit on December 22, 2017. Doc. 1. He made his first TTY call at the Jail on January 10, 2018. Docs. 121, 124 at ¶ 44. On January 11, Reyes moved for a

temporary restraining order and preliminary injunction. Doc. 13. On January 29, Rivero-Canchola emailed correctional staff to confirm that they were offering Reyes TTY calls. Doc. 117 at ¶ 41. On February 8, the court entered an agreed order providing that Dart would give Reyes "daily access to a TTY … Monday through Sunday for thirty minutes" and would make the TTY accessible "at a scheduled time" on weekends, but noting that Reyes would receive TTY access only if he asked for it. Doc. 29 at ¶¶ 1-2. From February 8, 2018 until at least April 2, 2018, Jail staff did not have a schedule for Reyes to use the TTY on weekends, and there is no documentation showing that Reyes was provided TTY access on weekends from January 18, 2018 through March 10, 2018. Docs. 121, 124 at ¶¶ 47-48.

### E.  Access to ASL Interpreters and ALDs

The parties dispute whether ASL interpreters and ALDs were available to detainees during Reyes's time at the Jail. Dart asserts that Reyes's requests for ALDs were not denied and that ASL interpreters were available. Doc. 117 at ¶¶ 38, 40, 61-62, 64-65. Dart admits, however, that Reyes was not provided an ALD during visits with friends and family from May 28, 2017 through December 31, 2017, Docs. 121, 124 at ¶ 54, and that he was not provided an ASL interpreter or an ALD at the November 17, 2017 disciplinary hearing that resulted in his transfer to the "hole," *id*. at ¶ 60. (Cook County's objection to this fact, Doc. 121 at ¶ 60, is overruled because the material cited by Reyes supports it.)

Reyes asserts that detainees had little if any access to ASL interpreters or ALDs in the RTU and Division 10. Docs. 121, 124 at ¶¶ 50-51, 69-70. (He submits no evidence concerning whether he had such access in Division 9.) As to the RTU, Reyes asserts that neither ASL interpreters nor ALDs were provided for religious services, art therapy, or group therapy. *Id*. at ¶¶ 50-51. (Dart's objection to this fact, Doc. 124 at ¶ 51, is overruled because it is supported by

RTU Superintendent Yoksoulian's deposition testimony. *E.g.*, Doc. 102-3 at 28 ("[Question:] During the art therapy programs, are deaf and hard-of-hearing prisoners given ALD devices? [Answer:] Not to my knowledge. [Question:] Are they given sign interpreters? [Answer:] No.").) Neither ASL interpreters nor ALDs were available to RTU detainees on a 24/7 basis, Doc. 121, 124 at ¶ 50, but voice amplifiers were available to communicate with hearing impaired individuals and staff made efforts to write things down or face detainees who could read lips, Doc. 117 at ¶ 47.

Citing Division 10 Superintendent Hugh Walsh's deposition testimony, Reyes asserts that neither ASL interpreters nor ALDs were available to facilitate participation in any program or service beginning in 2015 and continuing until February 2018, in the case of ALDs, and April 2018, in the case of ASL interpreters. Docs. 121, 124 at ¶¶ 68-70. (Dart's objection to this fact, Doc. 124 at ¶¶ 69-70; Doc. 131 at 3-4, is overruled. Walsh testified during his deposition that he "could contact external operations for an [ASL] interpreter" if one were requested. Doc. 117 at ¶ 51; Doc. 102-3 at 89. From this testimony, a jury *could* infer that when Walsh testified that ASL interpreters were unavailable in Division 10, he meant that he had to reach outside the unit to secure interpreters, who were readily available through external operations. But a jury also could interpret Walsh's testimony to mean only that he could always *ask* external operations for an interpreter. So understood, his testimony does not establish whether or in what circumstances external operations would have granted the request. A jury also could find that Walsh's testimony was inconsistent with other admissions he made at his deposition—for example, that Division 10 did not "*have access* to an [ASL] interpreter for a prisoner to participate in a religious program," and that "[t]here [were] no [ASL] interpreters … *provided* for programming" in Division 10, Docs. 121, 124 at ¶ 70; Doc. 102-3 at 80 (emphasis added)—thus creating a

factual dispute. *See Gil v. Reed*, 535 F.3d 551, 558 (7th Cir. 2008) ("Dr. Kim and Dr. Harms summarily opined that Reed had met the standard of care, but other contradictory portions of their testimony might undermine these conclusory opinions. A rational jury could determine from their inconsistent testimony that Reed did *not* meet the standard of care."); *Scott v. Edinburg*, 346 F.3d 752, 757-58 (7th Cir. 2003) (holding that a discrepancy in a police officer's deposition testimony concerning when the officer shot the decedent created a genuine factual dispute precluding summary judgment). Likewise, while Walsh testified that Division 10 detainees had twice used ALDs, he clarified that both instances occurred at some point during the six months preceding his August 2018 deposition. Doc. 102-3 at 79. That testimony is consistent with his later testimony that ALDs were unavailable to detainees from 2015 until February 2018, and in any event, any inconsistency creates a dispute of fact. *See Gil*, 535 F.3d at 558; *Scott*, 346 F.3d at 757.)

In all housing units, detainees could communicate in writing. Doc. 117 at ¶ 53.

### F.     Medical Treatment

Cook County is responsible for providing medical treatment to detainees at the Jail. Doc. 105 at 2. During his time as a detainee, Reyes had eight outpatient appointments. Doc. 118 at ¶¶ 18, 32; Doc. 134 at ¶ 5. No ASL interpreter was available on August 2, 2017 for his first appointment, so the appointment was rescheduled to August 3. Doc. 118 at ¶ 19; Doc. 134 at ¶ 5. ASL interpreters assisted Reyes at his August 3, August 25, and November 2 appointments. Doc. 118 at ¶¶ 19, 21, 25. No ASL interpreter was available at Reyes's November 30 appointment, so a physician's assistant conducted an abbreviated examination, communicating with him in writing, before rescheduling his appointment to December 7. *Id*. at ¶ 26. No ASL interpreter was provided at the December 7 appointment, so after another brief visit, during

which Reyes and the medical provider again communicated in writing, his appointment was rescheduled to December 12. *Id.* at ¶¶ 27, 29. An ASL interpreter was provided at the December 12 appointment. *Id.* at ¶ 30. No ASL interpreter was provided at a January 28, 2018 appointment, but Reyes communicated with medical personnel through lip-reading and talking before asking for an ASL interpreter, and he was told that the appointment would be rescheduled for a time when an interpreter was available. *Id.* at ¶ 5.

Reyes consulted at least three times with nursing staff in the Jail. *Id.* at ¶ 18; Doc. 134 at ¶ 2. Although no ASL interpreter was provided, Reyes's medical records reflect that he told the nurses why he had asked to see them and conveyed that he understood their instructions. Doc. 134 at ¶ 2. Additionally, when Reyes was sent to the "hole," a mental health professional communicated with him in writing while performing a Special Management Unit ("SMU") clearance evaluation, and other mental health professionals visited him six times on rounds. *Id.* at ¶¶ 3, 4. No ASL interpreter was used during those rounds. *Ibid.*

### Discussion

As noted, Reyes presses only his claims against Dart and Cook County under Title II of the ADA and § 504 of the RA. "Other than some minor differences not relevant here," the ADA and the RA "are coextensive." *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014); *see also Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 279 (7th Cir. 2003) ("[T]he ADA and the RA … run along the same path and can be treated in the same way … ."). The court therefore refers to the ADA and the RA together as the ADA.

"To prove a prima facie case of discrimination under Title II [of the ADA], a plaintiff must show: (1) that he is a qualified individual with a disability; (2) that he was denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to

discrimination by such an entity; and (3) that the denial or discrimination was by reason of his disability." *Lacy v. Cook Cnty.*, 897 F.3d 847, 853 (7th Cir. 2018) (internal quotation marks omitted). A plaintiff can recover damages under the ADA only for intentional discrimination. *See id*. at 856-57. "[A] plaintiff can establish intentional discrimination in a Title II damage action by showing deliberate indifference," which requires proof of "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id*. at 863. The parties agree that Reyes is no longer a pretrial detainee at the Jail and currently is in the custody of the Illinois Department of Corrections, a state institution not under Defendants' control. Docs. 121, 124 at ¶ 1; Doc. 102-2 at 7. Because Reyes is no longer in Defendants' custody, his request for injunctive relief is moot, *see Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012); *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011), meaning that he can pursue only damages relief.

The parties agree that a regulation implementing the ADA, 28 C.F.R. § 35.160, obligates the Jail to communicate effectively with hearing-disabled detainees. Section 35.160 provides: "A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). With respect to the obligation to provide auxiliary aids—a term that includes ASL interpreters, ALDs, and TTYs, *see* 28 C.F.R. § 35.104—Section 35.160 states:

> (1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities … an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity.
>
> (2) The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is

taking place.  In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(1)-(2).

The text of § 35.160 makes clear the following.  First, a public entity must furnish an auxiliary aid only when "necessary" to achieve effective communication, *id.* § 35.160(b)(1), meaning that the entity can defeat an ADA claim by "demonstrat[ing] that [an] effective means of communication" other than the plaintiff's preferred accommodation was made available.  28 C.F.R. pt. 35, App. A, Subpart E; *see Pollack v. Reg'l Sch. Unit 75*, 886 F.3d 75, 81 (1st Cir. 2018); *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (Title III case); *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1100 (9th Cir. 2013); *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001).  Second, despite this limitation on the scope of a public entity's duty, "primary consideration," 28 C.F.R. § 35.160(b)(2), must be given to the plaintiff's requested accommodation.  *See K.M. ex rel. Bright*, 725 F.3d at 1100-01; *Duvall*, 260 F.3d at 1137.  Third, whatever communication assistance the public entity furnishes must allow the plaintiff not just some access, but "equal" access, 28 C.F.R. § 35.160(b)(1), to the service, program, or activity in question.  *See Reed v. Illinois*, 808 F.3d 1103, 1107 (7th Cir. 2015) (emphasizing the word "equal" in § 35.160(b)(1)); *K.M. ex rel. Bright*, 725 F.3d at 1097 ("Title II and its implementing regulations, taken together, require public entities to take steps towards making existing services not just accessible, but *equally* accessible to people with communication disabilities … ."); *Loye v. Cnty. of Dakota*, 625 F.3d 494, 496 (8th Cir. 2010) ("[W]e construe Title II of the ADA as requiring that qualified persons with disabilities receive meaningful access to a public entity's services, not merely

limited participation.") (internal quotation marks omitted).  Finally, whether a public entity must provide an auxiliary aid depends on "the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place."  28 C.F.R. § 35.160(b)(2).  Evaluating and weighing those matters entails a fact-intensive inquiry often ill-suited for summary judgment.  *See Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018) ("The task of determining whether an entity subject to the RA has provided appropriate auxiliary aids where necessary is inherently fact-intensive and it is precisely because of this fact-intensive inquiry that an effective-communication claim often presents questions of fact precluding summary judgment.") (brackets omitted); *Folkerts v. City of Waverly*, 707 F.3d 975, 984 (8th Cir. 2013) ("The inquiry [under § 35.160] is inherently fact-intensive and largely depends on context.") (internal quotation marks omitted); *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 340 (4th Cir. 2012) ("What constitutes reasonable accommodations [under § 35.160] … is a question of fact and will vary according to the circumstances."); *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir. 2012) ("[T]he task of determining whether [a private] entity subject to the RA has provided appropriate auxiliary aids [under an analogous regulation] is inherently fact-intensive.").

## I.      Dart's Summary Judgment Motion

Dart argues that the Jail did not violate the ADA because Reyes was not denied the benefits of the Jail's services, programs, or activities.  Doc. 106-1 at 18-20.  Dart argues in the alternative that because Reyes cannot satisfy either prong of the deliberate indifference test, he is entitled to no damages and therefore cannot proceed on his ADA claims.  *Id*. at 13-18.  These arguments are addressed in turn.

### A. Whether the Jail Violated the ADA

#### 1. Day-to-Day Communications

Dart first submits that the ADA does not entitle Reyes to effective communication "at all waking moments of the day" because day-to-day communications are not programs, services, or activities for purposes of the statute. Doc. 106-1 at 19 (quoting Doc. 1 at ¶ 10). Dart further submits that the Jail need not "provide an interpreter" at all times because "in many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication." *Ibid.* (citing *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1087 (11th Cir. 2007)).

Dart misunderstands Reyes's ADA claim. Granted, the complaint alleges at one point that "Defendants virtually leave [P]laintiff without any ability to hear and communicate at all waking moments of the day." Doc. 1 at ¶ 10. As context makes clear, however, Reyes does not assert that he was entitled to communication assistance at all waking moments of the day; rather, he alleges that the Jail provided virtually no communication assistance at *any* point in the day. For purposes of avoiding summary judgment, Reyes has adduced evidence sufficient to show that this alleged near-total failure to provide communication assistance impaired his functioning in the Jail in specific ways—for example, that he was unable to defend himself adequately during a disciplinary hearing, Doc. 117 at ¶ 40, or to effectively communicate with visitors, Doc. 119 at ¶ 14.

Dart does not address whether these specific impairments of Reyes's functioning in the Jail involve services, programs, or activities for purposes of the ADA. Nor does Dart explain why oral communication, gestures, visual aids, and note writing were sufficient as a matter of law to permit Reyes to reap the benefits of the particular services, programs, and activities

allegedly denied to him. *See Bircoll*, 480 F.3d at 1087 ("In many circumstances, oral communication plus gestures and visual aids or note writing will achieve effective communication. *In other circumstances, an interpreter will be needed. There is no bright-line rule, and the inquiry is highly fact-specific.*") (emphasis added). Dart's failure to address these essential components of this aspect of Reyes's ADA claim results in a forfeiture. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived … ."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (same).

## 2.    Alcoholics Anonymous Meetings and Church Services

Dart next challenges Reyes's claim that he was denied equal access to Alcoholics Anonymous ("AA") meetings and church services. Doc. 106-1 at 19-20. Dart's first argument, that ASL interpreters and ALDs were available to Reyes on request, rests on disputed facts, as Reyes asserts, with record support, that those devices were not available to him in the RTU or Division 10. Docs. 121, 124 at ¶¶ 50-51, 69-70. Dart also argues that Reyes could achieve effective communication by reading lips, facial expressions, and gestures. Doc. 106-1 at 19-20. Resolving all factual disputes in Reyes's favor, as the court must in evaluating Dart's motion, a reasonable jury could find that those alternate means of communication did not give Reyes equal access to AA meetings and church services.

As noted, § 35.160 sets forth the considerations governing whether a public entity must provide an auxiliary aid. Starting with the "method of communication used," 28 C.F.R. § 35.160(b)(2), the court at this stage must accept Reyes's assertion that he prefers to communicate by using both an ASL interpreter and an ALD, but that he can read faces and gestures and can communicate in writing. Doc. 117 at ¶¶ 36, 59, 60; Docs. 121, 124 at ¶ 4.

Reyes acknowledges that he can read lips, but the court must credit his submission that "it's hard" for him to do so "because … everyone's lips are different." Doc. 117 at ¶ 60. As for the "length and complexity of the communication involved," 28 C.F.R. § 35.160(b)(2), church services and support groups like AA typically meet for medium or long periods several times per month, and the spiritual and therapeutic concepts and personal reflections shared during meetings are of moderate complexity—neither among the most complex communications, *see Liese*, 701 F.3d at 343 (consulting with a patient prior to emergency surgery), nor among the simplest, *see Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 787 (8th Cir. 2012) (explaining the basis for an arrest); *Bircoll*, 480 F.3d at 1087 (asking for consent to perform a breathalyzer test). As to the "nature" of the communication, 28 C.F.R. § 35.160(b)(2), the benefits of religious services or group therapy arise not from the mere transmission of information, but from the opportunity to worship, self-reflect, and commune with like-minded individuals. Finally, those communications take place in the prison "context," *ibid.*—a context that does not diminish the Jail's obligations under the ADA, *see* 28 C.F.R. pt. 35, App. A, Subpart E ("The Department [of Justice] consistently interprets … § 35.160 to require effective communication in courts, jails, prisons, and with law enforcement officers."), but which could be relevant if legitimate security concerns are present. *See* 28 C.F.R. § 35.130(h); *Chisolm v. McManimon*, 275 F.3d 315, 326 (3d Cir. 2001).

On the summary judgment record, a reasonable jury could find that Reyes's ability to read gestures and faces and to read lips with some difficulty did not allow him to participate in and enjoy the benefits of AA meetings and church services on terms equal to detainees without hearing-related disabilities. *See Crane*, 898 F.3d at 1135 (reversing summary judgment where the plaintiff adduced evidence that he "suffered a real hinderance due to his disability to provide

material medical information [to] his health care provider," even though he could communicate to some degree by writing and the healthcare provider was able to complete the medical evaluation); *Updike v. Multnomah Cnty.*, 870 F.3d 939, 942, 944, 953-57 (9th Cir. 2017) (reversing summary judgment on an effective communication claim even though the plaintiff was able to communicate to a limited extent by lip-reading and writing); *Liese*, 701 F.3d at 339, 340, 343 (same, even though the plaintiff was able to communicate to a limited extent by reading lips, writing notes, and pantomiming); *Chisolm*, 275 F.3d at 327 ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment."). A reasonable jury could rest that finding on the ground that Reyes could not decipher ideas of middling complexity—like the details of a sermon or an AA participant's personal anecdote—from facial expressions and non-ASL gestures alone. A jury also could infer from Reyes's description of his lip-reading abilities that he would be unable to understand everything that was said at a church service or AA meeting through lip-reading alone. Finally, even if Reyes were able to achieve some level of communication through lip-reading and speaking, a jury could find that an AA participant or churchgoer who must strain at every moment to understand leaders and other participants does not reap on equal terms the spiritual and therapeutic benefits provided by those programs.

In his reply brief, Dart contends that the Jail was not required to provide ALDs in light of their security risks. Doc. 131 at 4-5. That contention, raised for the first time in Dart's reply brief, is forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled

to find that Volvo waived the issue.").  Even setting aside forfeiture, the record does not support

the proposition that ALDs posed security risks.  Reyes adduces evidence that ALDs have never

been used as a weapon in the Jail.  Doc. 117 at ¶ 70.  Dart retorts that he need not provide any

such evidence because "[c]ommon sense dictates that almost any object can be used as a

weapon."  Doc. 131 at 4.  That kind of speculative security concern cannot defeat an ADA claim,

particularly on summary judgment.  *See* 28 C.F.R. § 35.130(h) ("A public entity may impose

legitimate safety requirements necessary for the safe operation of its services, programs, or

activities.  However, the public entity must ensure that its safety requirements are *based on

actual risks, not on mere speculation*, stereotypes, or generalizations about individuals with

disabilities.") (emphasis added); *Chisolm*, 275 F.3d at 327 ("[A prison's] repetition of the word

'security' in its brief and general references to 'security' issues in the warden's deposition are

not supported by any showing that 'security' in fact is implicated in making available to an

inmate at appropriate times the services and aids that [the plaintiff] requested.").

### 3.     TTY Access

Dart next challenges Reyes's claim concerning TTY access, arguing that TTYs were

"always available" to detainees on request and that Rivero-Canchola emailed Jail staff in January

2018 to ensure that Reyes received TTY access.  Doc. 106-1 at 20.  This argument fails on

summary judgment because it rests on disputed facts: Reyes adduces evidence from which a jury

could infer that TTY phone calls were not available to detainees on weekends from May 28,

2017, when he entered the Jail, until at least November 1, 2018; that he did not make his first

TTY call until January 20, 2018; and that he was not provided any weekend TTY access until

March 10, 2018.  Docs. 121, 124 at ¶¶ 36-38, 47-48, 63, 65.

Dart argues that even if the Jail failed to offer TTY phone calls to Reyes on weekends while giving non-disabled prisoners weekend phone access, the difference in treatment should be chalked up to "bureaucratic delay" of the kind that some courts have found not to violate the ADA. Doc. 131 at 8 (citing *Boston v. Dart*, 2016 WL 5373083, at *6 (N.D. Ill. Sept. 26, 2016); *Vande Zande v. Wis. Dep't of Admin.*, 851 F. Supp. 353, 361-62 (W.D. Wis. 1994), *aff'd*, 44 F.3d 538 (7th Cir. 1995)). Put another way, Dart contends that if Reyes asked for a TTY phone call on Saturday, it was not unreasonable for the Jail to respond that it could not fulfill his request until Monday. This argument misses the mark. The two cases cited by Dart stand for the proposition that a public entity is not liable under the ADA just because of *delays* in providing *equal* services to people with disabilities. *See Boston*, 2016 WL 5373083, at *6; *Vande Zande*, 851 F. Supp. at 361-62. Here, by contrast, Reyes contends that the Jail treated him *unequally* by systematically refusing TTY access on the weekends while systematically providing weekend telephone access to non-disabled detainees. Doc. 130 at 2-3. Put differently, Reyes complains not that the Jail dragged its feet in providing TTY access, but that TTY phone calls were not available on the weekends no matter how far in advance he requested them. *Ibid.* Those circumstances can support an ADA claim. *See Chisolm*, 275 F.3d at 329 ("To the extent that other, non-disabled inmates had access to communication by telephone, [the defendant] was required to provide [a plaintiff with a hearing disability] with such access on nondiscriminatory terms."); *see also Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016) ("This case does not turn on whether there is a standalone right to vote privately and independently without assistance. Plaintiffs' argument is that defendants have provided such a benefit to non-disabled voters while denying that same benefit to plaintiffs on the basis of their disability. This

is precisely the sort of harm the ADA [and 28 C.F.R. § 35.130(b)(1), a regulation imposing an equal access mandate similar to that imposed by 28 C.F.R. § 35.160(b)(1)] seeks to prevent.").

### B. Whether Reyes Can Recover Damages

As noted, an ADA Title II plaintiff can recover damages only by proving intentional discrimination, which can be established by showing deliberate indifference, which in turn requires proof of "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Lacy*, 897 F.3d at 863. Both elements are considered in turn.

### 1. Knowledge

A plaintiff can satisfy the knowledge element by showing that he "alerted the public entity to his need for accommodation or [that] the need for accommodation is obvious or required by statute or regulation." *Updike*, 870 F.3d at 951 (punctuation omitted); *see also Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1266 (10th Cir. 2018) (similar); *McCullum*, 768 F.3d at 1147 (similar). The ADA "do[es] not require the plaintiff to request a *specific* auxiliary aid" as long as he adequately "inform[s] the defendant of his need for an accommodation." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1198 (10th Cir. 2007).

Dart argues that before July 14, 2017, when the first medical alert was issued, the Jail did not know that Reyes had a hearing disability. Doc. 106-1 at 3, 13; Doc. 131 at 8. This argument rests on disputed facts: Reyes asserts, with record support, that he notified Jail staff of his hearing impairment and need for an accommodation both during his intake into the Jail and while housed in Division 9 from June 9, 2017 to July 24, 2017. Docs. 121, 124 at ¶¶ 26, 32. Dart does not acknowledge the evidence supporting Reyes's position or argue that his statements to Jail staff were insufficient to put him on notice of a potential violation, Doc. 106-1 at 13; Doc.

131 at 8, thereby forfeiting the point. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … .").

Next, Dart argues that during Reyes's and Rivero-Canchola's July 2017 meeting, they communicated so easily and effectively through lip-reading, speaking, and writing that she reasonably believed that he did not need auxiliary aids to communicate effectively. Doc. 106-1 at 13-14. This argument, too, rests on disputed facts: Although Dart asserts that Reyes appeared to understand Rivero-Canchola and did not ask for auxiliary aids, Reyes adduces evidence that he asked for an ALD, struggled to understand Rivero-Canchola, and asked her to bring an ASL interpreter to their next meeting, and both parties agree that she in fact brought an ASL interpreter to their August 2017 meeting. Doc. 117 at ¶¶ 24-25, 32, 58. A reasonable jury could infer from these facts that Rivero-Canchola knew from the July 2017 meeting that Reyes needed auxiliary aids to communicate effectively.

Finally, Dart seeks summary judgment on Reyes's TTY-related claim on the ground that the Jail did not know that he wanted access to a TTY. Dart is correct for the period from May 28, 2017 to November 8, 2017. Reyes first requested TTY access on July 31, 2017. Docs. 121, 124 at ¶ 41. Rivero-Canchola met with Reyes in August 2017 and reasonably believed based on their conversation that he wanted in-person visits instead of TTY calls. Doc. 117 at ¶¶ 27-28. There is no evidence that Reyes asked anyone at the Jail for TTY access between the August 2017 meeting and November 8, 2017, when he submitted a grievance requesting a TTY. Docs. 121, 124 at ¶ 66. Because the Jail reasonably did not know before that grievance that Reyes

wanted to use a TTY, the Jail was not deliberately indifferent before then in failing to provide one. *See McCullum*, 768 F.3d at 1149 (holding that a hospital was not deliberately indifferent in failing to provide interpretation services that the plaintiff did not request); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 266 (3d Cir. 2013) (holding that a school was not deliberately indifferent in mistakenly placing the plaintiff in special education classes, where her mother "agree[d] with, and g[ave] informed consent to, [her] placement in special education").

Reyes's November 8, 2017 grievance complaining that he did not have access to a TTY, however, put the Jail on notice that he wanted TTY access. Docs. 121, 124 at ¶ 66. True, Rivero-Canchola responded to the grievance by telling Reyes that he could arrange TTY access with a CRW, but Reyes adduces evidence that she knew at that time that CRWs could not arrange weekend TTY access. *Id*. at ¶¶ 63, 65, 67. A reasonable jury therefore could infer that the Jail knew as of November 8, 2017 that an ADA violation was substantially likely to occur.

### 2. Failure to Act

As to the failure to act element of deliberate indifference, Dart contends that (a) detainees generally had access to ASL interpreters, ALDs, TTY calls, and alternate communication methods like writing and gesturing, and (b) even if the Jail did not perfectly satisfy the ADA's requirements, the gaps in providing effective communication were so minor that they at most constituted negligence or bureaucratic slippage, not deliberate indifference. Doc. 106-1 at 14-18; Doc. 131 at 5. The legal premise underlying Dart's contention is correct, as "failure to act [for purposes of an ADA damages claim] is a result of conduct that is more than negligent, and involves an element of deliberateness." *Havens*, 897 F.3d at 1264 (brackets omitted); *see also Updike*, 870 F.3d at 951 (same); *S.H. ex rel. Durrell*, 729 F.3d at 263 ("[D]eliberate indifference must be a deliberate choice, rather than negligence or bureaucratic inaction.") (internal quotation

marks omitted). The trouble with Dart's position, at least on summary judgment, is that it rests largely on disputed facts, as Reyes adduces evidence sufficient for a jury to find that: (1) TTYs were not available on weekends until March 2018, Docs. 121, 124 at ¶¶ 36-38, 47-48, 63, 65; Doc. 117 at ¶¶ 67, 69, 76-80; (2) he was not provided ALDs for visits with friends or family until December 31, 2017, Docs. 121, 124 at ¶ 54; (3) he was not provided an ASL interpreter or ALD during a disciplinary hearing, *id*. at ¶ 60; (4) neither ASL interpreters nor ALDs were available for religious services, art therapy, or group therapy in the RTU, *id*. at ¶¶ 50-51; (5) neither ASL interpreters nor ALDs were available to participants in any program or service in Division 10 beginning in 2015 and continuing until February 2018 for ALDs and until April 2018 for ASL interpreters, *id*. at ¶¶ 69-70; and (6) he struggled to communicate with his sister in Division 10 because the visitation rooms were noisy and the Plexiglas barriers were dirty, *id*. at ¶ 56.

True enough, Dart cites undisputed facts showing that the Jail took *some* steps to accommodate Reyes's needs: (1) Rivero-Canchola met with Reyes in July and August 2017 and communicated with him at least two other times, Doc. 117 at ¶¶ 14, 22, 27; (2) Rivero-Canchola brought an ASL interpreter with her to the August 2017 meeting at Reyes's request, *id*. at ¶ 32; (3) Rivero-Canchola moved Reyes to Division 10 so that he could have in-person visits through Plexiglas, *id*. at ¶¶ 28, 30; (4) Rivero-Canchola told a Jail director in August 2017 that if Reyes were put on a "group based tier[,] we can get the [ALD] for him to use in groups," Docs. 121, 124 at ¶ 53; and (5) Rivero-Canchola reached out to Jail staff in January 2018 to ensure that Reyes had access to a TTY, Doc. 117 at ¶ 41. Doc. 106-1 at 14-16. But taking the record as a whole, a reasonable jury could still find that Dart failed to act for purposes of the deliberate indifference inquiry.

Reyes's version of the facts, if true, shows that Reyes struggled to communicate without auxiliary aids, but that he was provided little if any access to aids from the time he entered the Jail in May 2017 until he filed this lawsuit in December 2017 and for several months thereafter. Although Rivero-Canchola met with Reyes and sent emails concerning his communication difficulties on a handful of occasions, on Reyes's version of the disputed facts, those meetings and emails did not materially improve his access to auxiliary aids. Although Rivero-Canchola brought an ASL interpreter to the August 2017 meeting, that one-time accommodation did little to address Reyes's alleged inability to access the Jail's programs, services, and activities on a regular basis. And although Rivero-Canchola moved Reyes to Division 10 to accommodate his request for in-person visits, there is no evidence that she made further accommodations after learning from his November 8, 2017 grievance that he could not communicate with his sister in the Division 10 visitation room.

As Dart observes, the Jail had reason to believe that Reyes could mitigate his communication difficulties to some extent by writing, gesturing, and reading lips. Doc. 106-1 at 17; Doc. 131 at 5. But a jury could reasonably find that the Jail knew those alternatives would not permit Reyes to access its programs and services on equal terms with non-disabled detainees. *See Duvall*, 260 F.3d at 1139 ("[A] public entity does not 'act' by proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable."). As illustrated by the discussion of Reyes's access to AA meetings and church services, and resolving factual disputes in his favor, writing and gesturing did not permit him to access the Jail's services, programs, or activities that took place in a group, required sustained communication, or involved ideas of significant complexity. As for reading lips, a jury could infer that Rivero-Canchola knew from meeting

with Reyes that he struggled to communicate using lip-reading alone, and in any case, Reyes's lip-reading abilities would not permit him to talk on the phone or communicate with his sister through dirty Plexiglas. Thus, a jury could find that the Jail failed to act even though Reyes to some extent could communicate without aids. *See Crane*, 898 F.3d at 1136 (holding that a jury could find deliberate indifference even though the plaintiff and the defendant communicated to some extent using written notes); *Liese*, 701 F.3d at 351 (same, even though the plaintiff and the defendant communicated to some extent through writing, lip-reading, and pantomiming).

In sum, weighing the alleged length and extent of the Jail's failure to accommodate Reyes's needs against the evidence that the Jail made a few, largely ineffectual attempts to remedy his communication difficulties, a reasonable jury could find that the Jail was not merely negligent, but deliberately indifferent. *See Duvall*, 260 F.3d at 1140-41 (holding that a jury could find court staff deliberately indifferent where the court's ADA coordinator spoke to the plaintiff about his disability, but attempted to accommodate only some of his needs and did not take further action when told that the attempted accommodation was insufficient). It follows that Reyes may seek damages and therefore go to trial on his ADA claim.

## II.     Reyes's Summary Judgment Motion

Reyes moves for partial summary judgment as to liability on his ADA claims against Dart. Doc. 100. (He purports to move against Cook County as well, but none of his arguments address medical care, the only service that the County provides to him. Any argument by Reyes for summary judgment on his claims against the County is therefore forfeited, *see G & S Holdings*, 697 F.3d at 538; *Alioto*, 651 F.3d at 721, and in any event would fail for the reasons set forth in Section III, *infra*.) The myriad material disputes of fact that preclude summary judgment for Dart also preclude summary judgment for Reyes.

In seeking summary judgment, Reyes essentially argues that the Jail failed to provide him with the ASL interpreters, ALDs, and TTYs necessary to participate in the Jail's programs and services. Doc. 101 at 11-13. This argument rests on disputed facts, as Dart adduces evidence to support his contention that those aids were available to Reyes throughout his time at the Jail. Doc. 117 at ¶¶ 38, 40, 49, 61-62, 64-65. Granted, Dart admits that aids were not actually *provided* to Reyes in a few instances, Docs. 124, 121 at ¶¶ 26-27, 47-48, 54, 58, but those admissions do not entitle Reyes to judgment as a matter of law.

For example, while Dart agrees that Reyes was given no communication assistance during intake, he contends that intake personnel did not know that Reyes had a disability. Doc. 124 at ¶¶ 26-27; Doc. 117 at ¶¶ 7-8. Likewise, while Dart agrees that Reyes was not provided an ALD to participate in programs, services, or activities (excluding visits with friends, family, and counsel) from February 2, 2018 to April 11, 2018, and that he navigated a disciplinary hearing without an ASL interpreter or an ALD, Docs. 121, 124 at ¶¶ 58, 60, there is a genuine factual dispute as to whether Reyes needed these aids to reap the benefits of Jail programs or whether he was such a proficient lip-reader that he could achieve effective communication without them, Doc. 117 at ¶¶ 60, 72; Doc. 118 at ¶¶ 14, 20.

In other instances, Dart's admissions do not prove liability if all inferences are drawn in his favor, as they must on Reyes's summary judgment motion. *See Johnson*, 892 F.3d at 893. For example, while Dart admits that there was no schedule for Reyes to use a TTY on weekends from February 8, 2018 until April 2, 2018, and that there is no record of Reyes using a TTY on weekends before March 10, 2018, Doc. 124 at ¶¶ 47-48, those facts do not command an inference that Reyes was denied the benefits of weekend TTY access. A jury instead could infer that Reyes never asked for weekend TTY access, which was a prerequisite to access under the

agreed order. Doc. 29 at ¶¶ 1-2. Likewise, Dart admits that he did not provide Reyes with an ALD to use during visitation until at least December 31, 2017, despite receiving Reyes's November 8, 2017 grievance complaining about visiting conditions in Division 10. Doc. 124 at ¶¶ 54, 66. But Dart argues that a reasonable jury could find that any delays resulted from negligence, not deliberate indifference, Doc. 123 at 7-8, and Reyes does not argue otherwise, thereby forfeiting the point. *See G & S Holdings*, 697 F.3d at 538; *Alioto*, 651 F.3d at 721.

Because a jury could infer that the Jail did not violate the ADA, or at least did not do so with deliberate indifference, Reyes's summary judgment motion is denied. In so holding, the court notes that Reyes's moving papers repeatedly reference a 2012 Department of Justice investigation concerning ADA violations at the Jail that gave rise to a 2014 Implementation Plan and General Order in *United States v. Cook County*, 10 C 2946 (N.D. Ill.), Dkt. 13, as well as preliminary relief ordered in this case. *E.g.*, Doc. 101 at 2-3, 5, 13-14. Neither the issuance of those plans and orders nor any alleged failure to comply with them, standing alone, shows that Dart violated the ADA, so the court need not discuss them further. *See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573-74 (7th Cir. 1999) ("[P]reliminary injunctions are by their very nature, interlocutory, tentative, provisional, ad interim, impermanent, mutable, not fixed or final or conclusive, characterized by their for-the-time-beingness.") (internal quotation marks and brackets omitted); *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357-58 (7th Cir. 1997) ("[T]he decision to grant or to deny a preliminary injunction is not a decision on the merits of the plaintiff's suit.") (internal quotation marks omitted); *cf. Daniel*, 833 F.3d at 742 (observing that a Department of Justice Report finding that a prison provided inadequate healthcare was relevant to prisoners' § 1983 claims but was, "of course," "not conclusive").

### III. Cook County's Summary Judgment Motion

Cook County seeks summary judgment on Reyes's ADA claims arising out of his medical treatment—the only service the County provides to him at the Jail—arguing that his medical records show that medical personnel always communicated effectively with him, often using ASL interpreters. Doc. 105 at 8-11. Reyes offers three reasons why he was denied equal access during his medical visits. All are unpersuasive.

First, Reyes contends that he could not communicate effectively with medical personnel without an ASL interpreter. Doc. 120 at 7. Applying § 35.160(b)(2) to the record and drawing reasonable inferences in Reyes's favor, no reasonable jury could conclude that medical staff failed to communicate effectively with Reyes, even when they interacted with him without an interpreter. As to the "method of communication used," *ibid.*, Reyes contends that he prefers to communicate by hearing sound and through ASL, but admits that he can communicate through writing and can read lips with some difficulty. Doc. 117 at ¶¶ 59-60; Docs. 121, 124 at ¶ 4. In accounting for the "nature," "length," "complexity," and "context," of the communication, 28 C.F.R. § 35.160(b)(2), the court is mindful that conversations concerning healthcare can be quite extensive and complex, and the consequences of a communication breakdown can be severe. *See Updike*, 870 F.3d at 956 ("Medical evaluations often will be the type of complex and lengthy situation in which an ASL interpreter should be provided."); *Liese*, 701 F.3d at 343 ("[U]nder circumstances in which a patient must decide whether to undergo *immediate* surgery involving the removal of an organ under a general anesthetic … auxiliary aids limited to written notes, body gestures, and lipreading may be ineffective in ensuring that a hearing-impaired patient receives equal opportunity to benefit from the treatment."). But no evidence in the record

indicates that the medical appointments Reyes navigated without an ASL interpreter were long or complex.

At one of his three visits with the Jail's nurses, he complained of a stuffy nose and a cough. Doc. 112-5 at 40. At the other two, he asked the nurses to examine a swollen, tender bump on his leg. *Id*. at 49, 53. At each visit, the nurse documented that Reyes said he understood the nurse's instructions. Doc. 134 at ¶ 2. Likewise, when Reyes had outpatient medical consultations without an interpreter, the healthcare provider either briefly delayed treatment until an interpreter was available, Doc. 134 at ¶ 5, or conducted abbreviated visits, leaving a more detailed discussion of his medical concerns for a follow-up appointment with an interpreter present, Doc. 118 at ¶¶ 26-27. For those abbreviated visits, medical staff documented that Reyes understood them. *Ibid*.

Finally, although conversations involving mental health can be complicated, as when a patient must express complex feelings or describe traumas, *see Crane*, 898 F.3d at 1135, no record evidence indicates that Reyes's mental health consultations fit that profile. During Reyes's SMU clearance examination, the provider conducted a basic screening for signs of major mental health problems, like depression or suicidal tendencies, Doc. 112-5 at 89-91, and was able to communicate with him in writing, Doc. 134 at ¶ 4. During each mental health round performed after the intake examination, the provider documented ten simple indicators of mental health, including whether Reyes had visible bruises or other trauma markings and whether he was sleeping. Doc. 112-5 at 85-88. At no point did any mental health provider note any indication of past or present mental health issues, and there is no evidence that they rendered any treatment, eliminating the need for complex or lengthy follow-up. *Id*. at 85-91.

Given Reyes's lip-reading and writing abilities, the relatively basic concepts discussed at his medical visits, the documentation affirmatively showing that Reyes understood medical staff—and in the case of the outpatient visits, the follow-up appointments with an interpreter present—there is no basis for a jury to infer that Reyes was denied the benefits of the County's medical services due to his disability. *See Loye*, 625 F.3d at 500 (holding that the Department of Public Health did not violate the ADA where, in providing housing and health-related services to the plaintiffs, it used ASL interpreters during at least two meetings but only lip-reading and writing at later meetings where more simple issues were discussed).

Second, Reyes argues that he was treated less favorably than persons without a hearing disability in that some of his appointments were rescheduled because ASL interpreters were unavailable. Doc. 120 at 6. But the ADA did not require Cook County to serve Reyes in precisely the same way it served those without his disability; rather, it required the County to enable him to *participate* equally in and receive equal *benefits* from his medical visits. *See* 28 C.F.R. § 35.160(b)(1). One can imagine situations in which delay alone would prevent a detainee from using a jail's medical services on equal terms with non-disabled counterparts, as when the delay prolongs pain that an earlier visit could have alleviated or causes damage that earlier intervention could have prevented. But there is no evidence that any such thing happened to Reyes or that the delay otherwise prevented him from benefitting from and participating in the County's medical services. Nor has Reyes cited any legal authority suggesting that a delay in providing services in and of itself violates 28 C.F.R. § 35.160, thereby forfeiting any such argument. *See M.G. Skinner*, 845 F.3d at 321; *Judge*, 612 F.3d at 557.

Third, Reyes argues that Cook County violated the ADA when it refused, despite his repeated requests, to provide him a hearing aid. Doc. 120 at 7. But as the County correctly

notes, § 35.160(b)(2) requires public entities to provide requested auxiliary aids only if necessary to achieve effective communication. *See McCullum*, 768 F.3d at 1147 ("The [ADA's] regulations do not require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded."); *Duvall*, 260 F.3d at 1137 ("To prevail under the ADA, Duvall must show that the accommodations offered by the County [as alternatives to his requested accommodation] were not reasonable, and that he was unable to participate equally in the proceedings at issue."). Given the circumstances of Reyes's medical visits and on this summary judgment record, the County's failure to provide him a hearing aid, by itself, did not violate the ADA.

Accordingly, Cook County's summary judgment motion is granted, though the County will remain in the case for indemnification purposes pursuant to *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2003).

## Conclusion

Reyes's summary judgment motion is denied. Rivero-Canchola's and Cook County's summary judgment motions are granted. Dart's summary judgment motion is granted as to Reyes's § 1983 claims and as to the Jail's alleged failure to provide TTY access before November 8, 2017, but otherwise is denied. Reyes's surviving ADA claims against Dart will proceed to trial.

April 29, 2019

_____
United States District Judge